LOMAX, J.,
 

 delivered the opinion of the Court.
 

 Any statute tending to restrain the exercise of the freedom of speech, or supposed to have such tendency, should be strictly construed by the Courts. This should more especially be the case when the exercise of that freedom has for its object matters of religious doctrine and discipline. The acts of the Legislature should receive their construction in harmonious deference to the principles of the constitution relating to the freedom of speech and of religious faith. The Legislature has enacted (Sess. Acts 1847-8, ch. 10, $ 24,) that “any free person who, by speaking or writing, shall maintain that owners have not right of property in their slaves, shall be punishable by confinement in the jail, not more than twelve months, and by fine not exceeding five hundred dollars.” It is charged in the indictment that the defendant, on the 26th of March 1849, did, by speaking, maintain that owners have not right of property in their slaves. The words spoken are not, as in strictness perhaps they should have been, set out in the indictment, neither in their tenor nor in their substance. The proof is that the occasion of the alleged speaking was at a religious meeting, on Sunday before Christmas 1848, when the defendant, who is a minister of the gospel, preached a sermon from the text in the New Testament: “Ye are the salt of the earth,” or “Ye are the light of the world,”„in which he proceeded to point out the duty of Christians. The occasion was in itself innocent, and unless it be clearly shewn that its sanctity was abused to purposes plainljr illegal, the preacher who ministered should not be subjected to criminal animadversion. We may not unreasonably suppose, from such a text as that which was selected, the discourse was directed mainly to the professing Christian ‘members of that church, of which the defendant was the minister, to whatever denomination it may have belonged. In holding up the spirituality of their creed for their consideration, and the corresponding spirituality of life and conversation for their instruction and edification, he might well be allowed to admonish them to abstain from many indulgences, without questioning, in a secular point of view, the lawfulness of such indulgences. As was said by St. Paul in regard to his spiritual duties, “All things are lawful for me, but all things are not expedient; all things are lawful for me, but all things edify not.” To dissuade a member of a Christian flock from merchandizing in slaves, or taking and keeping human beings in slavery, may be done by a pastor, without any denial of the right of owners to- property in their slaves. A spiritual law, apart from human law, might be inculcated by him upon their consciences for their peculiar government, according to their creed, without exciting, or intending to excite, any spirit of rebellion against the law of the land; which, according to Christian doctrine, all are bound to obey. With the fullest sense of the sanctions with which the rights of owners to property in their slaves have been clothed by the law of the State, and the law of nations, and the law of the scriptures, and with the most profound submission to these sanctions, he might innocently urge an abstinence from the enjoyment of these rights, as not being expedient, or as inconsistent with the professions of a peculiar religious faith.
 

 It is incumbent upon the Commonwealth to shew, in the alleged speaking, that the defendant denied the right of owners to property in their slaves; and also, to shew that that denial was maintained by him; which would seem to imply the consideration of an effort made, by adducing facts, or proofs or arguments, to verify that denial. The defendant’s language must ‘plainly express that denial, or, in its plain meaning, necessarily imply it. Its import of the offensive proposition, owners have no,right of property in their slaves, must be clear and without any ambiguity of construction, leading to a meaning that is wholly innocent. The evidence is, that in the discourse which the defendant preached upon the text before cited, after proceeding to point out the duty of Christians, towards the conclusion of his discourse, the defendant cited a passage of scripture, which related to the overthrow
 
 *316
 
 of the tables of the money changers in the temple; and said, those persons (alluding to the money changers,) were pronounced by our Saviour, thieves and robbers; and there are thieves and robbers in the church at this day. If I were to go to my neighbour’s crib and steal his corn, you would call me a thief; but that it was worse to take a human being and keep him all his life, and give him nothing for his labour, except once in a while a whipping or a few stripes. And this remark was understood by the witness, to refer to slaveholders; though the words slaves or slaveowners were not used by the defendant in his discourse.
 

 If it was the design of the defendant in this discourse, to dispute or deny any rights of property, there was no fitness for such a purpose in the incident cited by him. In that transaction our Saviour was vindicating no rights of property; nor was he accusing or judging the offenders, in any secular sense, for any transgression of civil or social rights. It was not for any crime against the judicial law that he reproved them; but for the spiritual sin of desecrating His father’s house—the house of prayer, and by their unholy and sacriligeous pursuit of gain in the temple, converting it into the den of thieves. The right of property of the money changers and those who bought and sold in the temple, was not animadverted upon or questioned. The language *was strongly figurative. It could not literally be understood that the temple had sunk into a den by reason of its desecration, nor could the money changers and those who bought and sold, with a title unimpeached in the money and the goods, be literally understood to be thieves, in the sense of those who had stolen property, because of the sinful cupidity, in the indulgence of which they may have shewn a strong resemblance to thieves. It was their spiritual guilt and not any secular criminality He was reproving. Thieves were spoken of, upon the occasion, in a sense similar to that when upon another occasion, He said, “he that entereth not by the door into the sheep-fold, but climbeth up in some other way, is a thief and a robber.” There seems therefore, no warrant found in the passage cited by the defendant from the scripture, for interpreting his denunciation of thieves and robbers in the church at this day, in any other sense than as sinners, not as malefactors against any social or civil rights of property. So understood, the words thieves and robbers could cast no hue of criminal import upon the rest of the defendant’s expressions. But, supposing that the words thieves and robbers were used by the defendant in the ordinary sense of larcenous violators of the rights of property, it would be extremely difficult to find a construction of this obscure and incoherent fragment of the defendant’s discourse, as presented by the testimony, that would make it tantamount to the offensive proposition, distinctively expressed in the statute, that owners have not right of property in their slaves; and which the law requires should be proved to have been clearly maintained by the alleged speaking. The matter which, it would seem, the defendant proposed to maintain was, that there were thieves and robbers in the church at this day. With that proposition, whether understood in a spiritual or worldly sense, the penalties of the law have no concern. All that followed the ^enunciation of that'- proposition, seems to have been adduced as proofs and arguments, or as the witness tells us an illustration, (such as they were,) to maintain that main proposition, without any effort to maintain, the matters themselves which were so adduced. “If I were to go to my neighbour’s crib and steal his corn,” say's the defendant, “you would call me a thief. ’ ’ That may be very true. But taken in the hypothetical manner in which it was spoken, without any direct connection with or pertinent application to the matter in hand, it is not easy to perceive its bearing, as an argument or illustration to maintain the point proposed, that there were thieves and robbers in the church at this day. In connection and in dependence upon this vague and apparently incoherent assertion as to the crime of stealing corn from a neighbour’s crib; and by way of comparison with it, he proceeds to assert, without any argument or proo^to maintain, that “it is worse (than thus stealing corn,) to take a human being and keep'him all his life, and give him nothing for his labour, except once in a while a whipping ora few stripes.” We will not pause to enquire whether this remarlspmiust necessarily, in legal construction, have reference to slaves and slaveowners. The witness so understood it. In this casuistry, in the comparison of hypothetical guilt, ' why was this taking and keeping, as described, worse than stealing the corn? Furtively, to take and keep a slave, as in the case of the corn, is legally and morally admitted to be worse. So inhumanly' to take and keep a slave in the manner described, without anyr recompense, of suitable comforts or necessaries, for his labour, except once in a • while a whipping, &c., might, to the feelings of a humane casuist, be worse in the scale of guilt, than stealing corn; or worse than murder, or arson, or other crime against the person or property of another. In either of these views, this remark made to maintain the proposition that there were thieves and robbers *in the church, &c., would be entirely innocent. If there be any ambiguity in its meaning, why should a Court, guided by the spirit of the constitution, which favours the freedom of speech and of religious faith, reject in this criminal prosecution, this innocent construction, and fasten upon another, that makes such speaking a crime? To arrive at that criminal meaning, it will be necessary for the Court, by construction to supply other words as spoken or intended by the defendant, which he did not speak or necessarily intimate. We must make him
 
 *317
 
 say, that to take and keep a human being (or say slave,) is worse than stealing corn, such taking and keeping being equally without right of property in the slaveowner, as in the thief who has stolen the corn.
 

 This case comes before this Court upon a question adjourned by the Circuit court upon a motion for a new trial, after a verdict of conviction. There has been no ratification or concurrence of the Judge who presided at the trial in that verdict. This Court therefore, upon this question occupies the seat of that Judge, upon the motion pending before him. Upon the matters so adjourned, this Court is of opinion that the proofs set forth in the record are not sufficient for the conviction of the accused in this case; and consequently that the motion for a new trial should be allowed.